UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARGARET STOFSKY and ERIC STOFSKY,

Plaintiffs,

-v-

PAWLING CENTRAL SCHOOL DISTRICT,
PAWLING CENTRAL SCHOOL DISTRICT
BOARD OF EDUCATION, GEORGE NEWMAN,
individually and in his offical capacity as Pawling
Central School District Director of Special Services,
CHERYL THOMAS, individually and in her official
capacity as Principal for the Pawling Central School
District Middle School, FRANK DeLUCA,
individually and in his official capacity as former
Superintendent of Schools, JOSEPH SCIORTINO,
individually and in his official capacity as
Superintendent of Schools, PAULINE KAPLAN,
individually and in her capacity as President of the
Pawling Central School District Board of Education,
FRANK TOLAN, individually and in his official
capacity as Principal of Pawling Central School
District's High School, and 1-100 UNKNOWN
ADMINISTRATORS OF THE PAWLING
CENTRAL SCHOOL DISTRICT, individually and in
their official capacity,

Defendants.

Case No. 06-CV-10231 (KMK)

OPINION AND ORDER

Appearances:

Peter David Hoffman, Esq.
Law Office of Peter D. Hoffman, P.C.
Katonah, NY
*Counsel for Plaintiff*

Gregg Tyler Johnson, Esq.
Jacinda Hall Conboy, Esq.
Scott Patrick Quesnel, Esq.

Girvin & Ferlazzo, P.C.
Albany, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Margaret Stofsky ("Plaintiff") brings this action alleging, *inter alia*, discrimination and retaliation in connection with her former employment as a school psychologist in the Pawling Central School District (the "District"), seeking relief against the District and the District's Board of Education (the "Board") (together, the "District Defendants"), as well as against several former and current District administrators (the "Individual Defendants").  Following dismissal of several of Plaintiff's claims by Judge Colleen McMahon, to whom this case was originally assigned,[1] Plaintiff's remaining claims are causes of action (1) against the District Defendants for gender and age discrimination and harassment, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; (2) against the District Defendants for retaliation occurring after July 28, 2005, pursuant to Title VII, the ADEA, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; and (3) against all Defendants for denial of equal protection, pursuant to 42 U.S.C. § 1983 ("Section 1983").  Defendants moved for summary judgment, and Plaintiff and Defendants also moved *in limine* to exclude from trial certain expert testimony on the issue of damages.  For the reasons stated herein, Defendants' motion for summary judgment is granted, and the motions to exclude testimony are denied as moot.

---

[1] The case was reassigned to this Court on August 6, 2007.

2

I.  Background

A.  Facts

1.  Plaintiff's Hiring and Job Duties

Plaintiff was hired by the District as a School Psychologist beginning September 1, 1993. (Defs.' Statement of Material Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1") ¶ 1.)  At the time, she was forty-three years old.  (Decl. of Peter Hoffman in Opp'n to Defs.' Mot. for Summ. J. ("Hoffman Decl.") Ex. A (Dep. of Margaret Stofsky ("Pl. Dep.") 31).)  The hiring committee considering Plaintiff's application included Frank Tolan, who served as Principal of the District's High School throughout Plaintiff's employment with the District (Aff. of Frank Tolan in Supp. of Defs.' Mot. for Summ. J. ("Tolan Aff.") ¶ 1), and Karen Arnhold-Falanga, who was a School Psychologist for the District.  (Pl. Dep. 30.)

From the beginning of Plaintiff's employment with the District through the 2003-04 school year, the District employed two School Psychologists, Plaintiff and Arnhold-Falanga. (Defs.' 56.1 ¶¶ 36-37.)  Plaintiff was responsible for the High School, Arnhold-Falanga was responsible for the Elementary School, and Plaintiff and Arnhold-Falanga were each responsible for "half of the Middle School caseload."  (Aff. of George Newman in Supp. of Defs.' Mot. for Summ. J. ("Newman Aff.") ¶ 3.)  As of September 2001, following the construction of the new Middle School (Aff. of Cheryl Thomas in Supp. of Defs.' Mot. for Summ. J. ("Thomas Aff.") ¶ 15), the High School covered grades 9 through 12, and the Middle School covered grades 5 through 8.  (Pl. Dep. 100.)

The duties and responsibilities of a School Psychologist are outlined in a job description

3

produced by the District.  (Aff. of Matthew Crandell in Supp. of Defs.' Mot. for Summ. J. ("Crandell Aff.") ¶ 6.)  As members of the District's Special Education staff, School Psychologists report to the Director of Special Education, who may assign them unspecified "appropriate responsibilities" in addition to those specified in the job description.  (Crandell Aff. Ex. O (Job Description), 1, 3.)  School Psychologists are appointed to serve on Child Study Teams, the District Committee on Special Education ("CSE"), and other District-wide committees.  (*Id.* 1.)  They carry out testing, including "Psychological and Triennial evaluations," for the CSE, "perform counseling evaluations as recommended by the Child Study Teams," meet with parents to explain test results, and "act as 'case manager' [for] students referred to the CSE."  (*Id.* 2.)  School Psychologists work with teachers and other staff "to develop behavior modification plans or consult in other appropriate areas," work with parents "as needed to develop realistic expectations of children's progress," meet with parents "when issues surface in classrooms," and "may be requested to provide inservice on clinical issues for teaching staff."  (*Id.*)  They also counsel students, either individually or in small groups.  (*Id.*)  Finally, School Psychologists "provide[] the initial intervention and direction when a crisis occurs," and "may be requested to intervene with at-risk students in special situations."  (*Id.* 3.)

          2.  Concerns With Plaintiff's Job Performance Prior to the 2004-05 School Year

According to Tolan, Plaintiff "failed to keep appropriate records pertaining to students she counseled" for "several years prior to June 2004."  (Tolan Aff. ¶ 4.)  Tolan also received complaints from parents and teachers of special education students that Plaintiff was not counseling students in accordance with their Individualized Educational Plans ("IEPs").  (*Id.*)  Some parents even asked that their children not be counseled by Plaintiff.  (*Id.*)  At some point

prior to the 2004-05 school year, Tolan expressed his concerns about Plaintiff to then-Superintendent Frank DeLuca, who advised Tolan "to develop an accountability system to help [Plaintiff] improve, and to ensure that she was complying with her job requirements." (Aff. of Frank DeLuca in Supp. of Defs.' Mot. for Summ. J. ("DeLuca Aff.") ¶ 4.)

Tolan worked with Plaintiff "to develop a system for scheduling and evaluating students that would help her organize her tasks," and held several meetings with Plaintiff and a union representative to discuss Plaintiff's schedule. (Tolan Aff. ¶ 5.) According to Tolan, Plaintiff was "reluctant to change her practices" and "questioned [Tolan] as to why [Tolan] needed counseling records from her." (*Id.*) Tolan told Plaintiff that he "required all teachers to maintain lesson plans . . . [and] all guidance counselors to turn in records of students they counseled, and thus, it was a matter of consistent practice that the school psychologists turn in records of students they counseled." (*Id.*)

George Newman, who in March 2003 became the District's Director of Special Education and therefore Plaintiff's supervisor, considered Plaintiff to be a "very bright" and knowledgeable School Psychologist who wrote "very good" reports. (Hoffman Decl. Ex. O (Dep. of George Newman ("Newman Dep.") 91).) However, Newman was concerned that Plaintiff "had been failing to submit psychological reports and student progress reports in a timely manner" and "was repeatedly missing counseling sessions with students who were assigned to her." (Newman Aff. ¶ 4.) Newman was informed at one point that Plaintiff had missed 157 counseling sessions with students. (*Id.*) Tolan told Newman that Plaintiff "was not completing the required testing for special education students" and also "missed numerous counseling sessions." (*Id.* ¶ 5.) Newman met with Plaintiff during the 2003-04 school year "to

discuss these concerns, and to talk to her about how to manage her time more effectively." (*Id.* ¶ 4.)

At Plaintiff's deposition, she described a series of work-related conflicts involving herself and Tolan. According to Plaintiff, during her employment with the District, "people who had authority over [her]," including Tolan, "would talk to [her] in loud or rude and disrespectful ways." (Pl. Dep. 128.) In November 2003, Plaintiff attended a meeting at which Tolan and Newman were also present, where Tolan "accused [Plaintiff] of dumping some responsibility on him" with respect to a particular Middle School student.[2] (*Id.* 152-53.) At unspecified times, Tolan "screamed" at Plaintiff, accused Plaintiff of lying, told Plaintiff that she was not worth the salary she was making and that he would like to spend it elsewhere, and walked by Plaintiff's office to check up on her. (*Id.* 133.) Tolan also warned Plaintiff that he would tell the "special ed directors" that Plaintiff was not doing what Tolan wanted her to do and was not counseling students in accordance with their IEPs; according to Plaintiff, Tolan did in fact tell the special ed directors these things. (*Id.* 134.) During unspecified staff meetings, Tolan would interrupt Plaintiff. (*Id.* 135.) At some point, Tolan ordered Plaintiff to find a certain student, and when Plaintiff could not locate the student, Tolan yelled at Plaintiff in presence of secretaries. (*Id.* 135-36.) Plaintiff stated at her deposition that she did "not think . . . Tolan routinely went about screaming at any other males, [and] certainly not pretty young females."[3] (*Id.* 158.)

---

[2] Plaintiff also recalled that Newman did not "stand[] up" for Plaintiff at this meeting. (Pl. Dep. 152.)

[3] However, according to Matthew Crandell, a male who has worked at the High School since 2004, "throughout my tenure there has been a degree of tension between Frank Tolan and myself," and "Tolan has occasionally raised his voice, treated me in an intimidating manner, and placed blame on me due to a misunderstanding." (Crandell Aff. ¶ 8.)

According to Plaintiff, concerns about her work performance were also raised, prior to the 2004-05 school year, by Cheryl Thomas, who at the time was Principal of the Middle School. (Pl. Dep. 138.) In the spring of 2004, Thomas sent Plaintiff a memorandum asking Plaintiff to account for her time, "implying that [she] had missed all these [counseling] sessions"; Thomas also told Plaintiff that Thomas "had been told that [Plaintiff] had a reputation for not seeing kids that [she] was supposed to." (*Id.*)

### 3. Plaintiff's Workload-Related Complaints Prior to the 2004-05 School Year

Prior to the start of the 2004-05 school year, Plaintiff requested for her "workload to be reduced." (Pl. Dep. 93; Pl.'s Rule 56 Statement of Controverted Facts ("Pl.'s 56.1") ¶ 53.) Plaintiff told Newman that she had too much work to do. (Defs.' 56.1 ¶ 48.) Tolan and DeLuca were also aware that Plaintiff felt this way. (Tolan Aff. ¶ 5; DeLuca Aff. ¶ 7.)

Plaintiff "made requests from the very beginning of [her] employment [with the District] that it would be more effective to have [her] in one place or the other," i.e., to limit Plaintiff's responsibilities to a single school building. (Pl. Dep. 93.) Plaintiff also "made complaints to the District that [her] workload was inequitable." (*Id.* 97.) Under the official division of labor between Plaintiff and Arnhold-Falanga, Plaintiff was expected to cover students in grades 7 through 12 and Arnhold-Falanga was responsible for students in grades K through 6; however, according to Plaintiff, she worked with some students in grades 5 and 6 as well as some Elementary School students. (*Id.* 98-99.)

### 4. Plaintiff's Assignment to the Middle School

During the 2003-04 school year, Newman recommended to DeLuca that the District hire a third School Psychologist. (Newman Aff. ¶ 9.) According to Newman, he made the

recommendation to DeLuca "in part due to [Plaintiff's] perception that she was being overworked." (*Id.*) According to DeLuca, "Newman persuaded me that it would be beneficial for the District to have one School Psychologist in each building, as it would reduce the workload for the current School Psychologists." (DeLuca Aff. ¶ 7.)

The District subsequently decided to hire a third School Psychologist for the 2004-05 school year (Defs.' 56.1 ¶ 59), and in the summer of 2004, a committee was established to consider candidates to fill that position (Newman Aff. ¶ 10). Both Plaintiff and Newman were members of that hiring committee. (*Id.*; Pl. Dep. 94.) The District initially offered the position to a woman who had more than twenty years of experience as a school psychologist and neuropsychologist (Defs.' 56.1 ¶¶ 62-63), but that candidate declined the District's offer because "the District was unable to meet her salary requirements" (Newman Aff. ¶ 11; Pl.'s 56.1 ¶ 64). The District ultimately hired another candidate, Matthew Crandell, who is male and at the time of his hiring was under thirty years old (Crandell Aff. ¶ 4), following the hiring committee's recommendation (Defs.' 56.1 ¶¶ 60-61; Newman Aff. ¶ 11). Plaintiff concurred in that recommendation, but she claims that she recommended only that Crandell be hired on the condition that Plaintiff be assigned to work at the High School. (Pl.'s 56.1 ¶¶ 60-61, 66; Newman Aff. ¶ 11; Pl. Dep. 94.) Notwithstanding Plaintiff's supposed request, Crandell was assigned to the High School for the 2004-05 school year. (Defs.' 56.1 ¶ 65.)

Plaintiff thus was assigned to be School Psychologist at the Middle School for the 2004-05 school year. (Pl.'s 56.1 ¶ 66; Pl. Dep. 95; Newman Aff. ¶ 12; Thomas Aff. ¶ 5.) According to District administrators, there were at least four reasons that Plaintiff was assigned to the Middle School rather than to the High School. First, Plaintiff had already been trained and

involved in PACE, a program for children with autism that at the time was implemented at the Middle School but not at the High School, whereas Crandell had received no such training. (Tolan Aff. ¶ 8; Defs.' 56.1 ¶¶ 55-56.)  Second, District administrators believed that Thomas was "very organized," and that Plaintiff would "benefit from Dr. Thomas's organizational skills" (Tolan Aff. ¶ 8; Newman Aff. ¶ 13); moreover, "Dr. Thomas welcomed [Plaintiff] to come [to the Middle School] and also offered to help with [her] organization and planning" (Newman Dep. 168-69).  Third, due to "the numerous complaints" that High School teachers and Guidance Counselors had made about Plaintiff, Newman "felt that reassigning [Plaintiff] to the Middle School would provide her with a fresh start that would be both beneficial to her as well as the teachers and Guidance Counselors at the High School."  (Newman Aff. ¶ 14.)  Fourth, Tolan preferred that Plaintiff be assigned to work at the Middle School rather than the High School; he wanted a School Psychologist at the High School "who would do the counseling and the evaluations."  (Newman Dep. 100, 169.)

Plaintiff, at her deposition, stated that she was told that her assignment to the Middle School was due to "ongoing friction" between herself and Tolan.  (Pl. Dep. 95.)  According to Plaintiff, no other reason was given to her.  (*Id.* 96.)  When asked whether Plaintiff believed that she had taken any action that caused the District to reassign her to the Middle School, Plaintiff stated that she did not.  (*Id.* 108.)

Plaintiff complained to Arnhold-Falanga, to Newman, and to union officials that she did not want to be reassigned to the Middle School.  (*Id.* 89, 109).  She told Newman and union officials that she felt she was "being moved unfairly."  (*Id.* 110.)  Plaintiff "begged" Newman not to assign her to the Middle School, and asked him, "why doesn't seniority count for

anything[?]"  (*Id.* 89.)  According to Plaintiff, she "didn't want to leave the building that [she] had worked in for all of the preceding years where [she] had developed relationships with the faculty, . . . students, [and] guidance counselors"; moreover, she particularly enjoyed working with High School students.  (*Id.* 92-93.)

Although Plaintiff filed many union grievances against the District during her employment (*id.* 24), she did not file a grievance concerning her assignment to the Middle School (*id.* 107).

### 5.  Plaintiff's Job Responsibilities During the 2004-05 School Year

After Plaintiff's reassignment to the Middle School for the 2004-05 school year, Plaintiff continued to be responsible for at least one student outside of the Middle School.  (Pl.'s 56.1 ¶ 73.)  At her deposition, Plaintiff said that she had to evaluate at least one High School-age individual subsequent to the start of the 2004-05 school year but that this was only the only non-Middle School responsibility she could recall.  (Pl. Dep. 112, 115.)  However, Plaintiff's assignment to the Middle School did not substantially reduce her workload as compared to previous years.  (*Id.* 99-100.)  Although Plaintiff could not remember how many Middle School students she was responsible for in 2004-05, she asserted that she had just as many students as before, because students were added to her workload that had been previously handled by the guidance department rather than by a School Psychologist.  (*Id.* 100-01.)

Plaintiff stated that during the 2004-05 school year she had "counseling responsibilities," "evaluation responsibilities," "reevaluation responsibilities," "crisis intervention responsibilities," "teacher consultations," and "administrative responsibilities," as well as the responsibility to observe and evaluate students "out of the District," "prep for and be the

District's witness in hearings," "write reports," "keep an accounting of [her] time," attend "ten

CSE meetings," attend meetings at the behest of guidance counselors, "speak to parents,"

"keep[] . . . documentation on IEP correct," "develop[] presentations for staff," "teach[] teachers

how to . . . score achievement tests," "present[] at superintendent's conference days," "attend[]

. . . manifestation hearings . . . regarding students," and "do all of the individual counseling and

some of the group counseling for the As[p]erger Program that [she] had helped develop."  (*Id.*

103-05.)

<u>6.  Plaintiff's Complaints and Requests Concerning Her Middle School Office</u>

According to Thomas, when Plaintiff was assigned to the Middle School for the 2004-05

school year, Plaintiff requested that she be given a "a private room with no carpeting" as her

office.  (Thomas Aff. ¶ 15.)  Such an office was "built specifically for" Plaintiff in or about the

summer of 2004, when the District divided a "very large classroom" into a smaller classroom

and two offices.  (*Id.*)  A "new HVAC system" was installed in the office space.  (*Id.*)

According to Plaintiff, she was assigned to this office despite her requests to Newman that she

not be assigned there because the space "was known to have an extreme heat problem," as it

"had been a science room with solar capacity for plants, much like a greenhouse."  (Pl. Dep.

120.)  According to Thomas, due to the installation of the new HVAC system Thomas did not

anticipate that the office would have any temperature problems.  (Thomas Aff. ¶ 15.)

During the 2004-05 school year, Plaintiff made several complaints about her office,

including that it was sometimes too hot[4] and sometimes too cold, that water leaked into the room

---

[4] According to Plaintiff, "it was over 100, 109 [degrees] sometimes in there."  (Pl. Dep.
122.)

when it rained,[5] that the room was sometimes damp, that her files and equipment were not there at the start of year, and that there was not enough space.  (*Id.*; Newman Aff. ¶ 16; Pl. Dep. 124-25.)  Plaintiff directed these complaints to Newman, Thomas, District head of maintenance Rob Hamilton, and Assistant Superintendent Sonya Taylor.  (Pl. Dep. 122-24; Newman Aff. ¶ 16.) According to Thomas, Plaintiff requested "that film be put on the windows to reduce the amount of sunlight coming through, and that the seal be fixed to keep water from leaking in."  (Thomas Aff. ¶ 15.)  According to Plaintiff, she asked Taylor for the addition of wall cabinets to the office so that there would be more space, and in the alternative for a different office.  (Pl. Dep. 125.) Plaintiff also requested that the air conditioning in the office be adjusted.  (*Id.* 122.)

In response to Plaintiff's complaints, Thomas "asked building and grounds to install . . . heat shields . . . to deflect the sunlight," and these were installed in April 2005; Thomas also asked Plaintiff to keep a record of the temperature in her office.  (*Id.* 119; Thomas Aff. ¶ 15.) Thomas could not herself adjust the temperature because "all adjustments to the HVAC system in the building had to be made at the High School via a computerized system."  (Thomas Aff. ¶ 15.)  Plaintiff said that Hamilton likewise told her that he could not adjust the air conditioning. (Pl. Dep. 122 ("It can't get turned on.  It can't get turned off.  It can't get adjusted.  It had time frames.").)  Thomas said that she told Plaintiff "that [Plaintiff] could use an alternative room whenever she wished,"[6] and that Thomas submitted all of Plaintiff's requests and complaints to

---

[5] According to Thomas, she had not received any complaints about water in the classroom prior to the summer 2004 renovations.  (Thomas Aff. ¶ 15.)

[6] At her deposition, Plaintiff denied that she was "ever offered any other office at the middle school," though it is unclear whether Plaintiff was contradicting Thomas's statement or whether she simply meant that she was never offered the chance to *permanently* move her office. (Pl. Dep. 123 ("When it was flooded I think I was told that I could — no, I wasn't offered another office, no.").)

the Facilities and Operations Department, "direct[ing] that all repairs be made." (Thomas Aff. ¶ 15.) When Plaintiff complained about her room to Newman, Newman advised Plaintiff to "submit a written request for maintenance," and also informed Thomas and Hamilton of Plaintiff's complaints. (Newman Aff. ¶ 16; Newman Dep. 132.)

In Plaintiff's view, the problems with the heat and air conditioning in her office were not timely addressed. (Pl. Dep. 126.) Plaintiff perceived Thomas, Newman, and Hamilton as having ignored the problems with her office, because Plaintiff notified them of the problems in November 2004 and they were not fixed until April 2005. (*Id.* 130.) Plaintiff believed that the District was "retaliat[ing]" against her by refusing to "mak[e] a reasonable office change" following her complaints about her office. (*Id.* 121.) At her deposition, Plaintiff said that her request for wall shelving in her office was ultimately denied, though she could not recall when. (*Id.* 118, 130.)

### 7.  Plaintiff's Parking-Related and Other Requests

Plaintiff stated in her deposition that, sometime prior to the 2004-05 school year, she told Tolan that she had "allergies, history of asthma, [and] history of bronchitis," and requested that she be permitted to park in a handicap parking space in front of the High School building on cold days "so that I wouldn't have to be breathing the cold air." (*Id.* 120-21.) Tolan denied her request, as well as her request for "a key to the back entrance," which she had sought so that she would "not have to walk from the parking lot up and around because the doors are locked." (*Id.* 121.)

Thomas also was aware that Plaintiff had asthma (Thomas Aff. ¶ 17); according to Plaintiff, she also notified Thomas of her "history of pneumonia, history of bronchitis,

fibromyalgia, . . . arthritis, [and] mold allergies" (Pl. Dep. 117).  According to Thomas, "[o]n one occasion" Plaintiff asked for permission to park closer to the school building; in response, Thomas "allowed her to park in a lot that was reserved mainly for kitchen staff and traveling teachers."  (Thomas Aff. ¶ 17.)  However, according to Plaintiff, Thomas told Plaintiff that she "could not use the parking lot close to the building" where Plaintiff wanted to park; instead, Thomas said Plaintiff "could get a doctor's note saying [she] had a disability and use the disabled parking," and Plaintiff did procure a handicap parking sticker, which she used to park "in the lot closer to the building with . . . handicap parking."  (Pl. Dep. 118-19.)

According to Plaintiff, she also "notified" Thomas that she "would have to sometimes put [her] belongings on the elevator and then walk upstairs to get [her] belongings off the elevator," and requested that Thomas install an intercom system in the hallway.  (*Id.* 117-18.)

Plaintiff said at her deposition that "things that happened" to her, including "having been denied" "a parking space closer to the building," "felt like retaliation."  (*Id.* 108.)

### 8.  Continued Concerns With Plaintiff's Job Performance

During the 2004-05 school year, Thomas received complaints from parents that Plaintiff was not counseling their children in compliance with their IEPs.  (Thomas Aff. ¶ 6.)  Some parents also told Thomas that they "did not want their children to continue counseling with [Plaintiff] because she would fail to show up for scheduled counseling sessions."  (*Id.*)  Special education teachers also informed Thomas that Plaintiff was not counseling their students as scheduled.  (*Id.*)  Thomas also "discovered" that Plaintiff "had indicated by initialing [certain] student reports that she had counseled [students] at certain times, but the teachers of the students could not confirm that these supposed counseling sessions took place"; Thomas consequently

concluded that Plaintiff "might have been falsifying some student records." (*Id.*)  When "confronted" by Thomas, Plaintiff said "that she had seen the students, but only for five minutes." (*Id.*)  According to a December 21, 2004 memorandum from Thomas to Plaintiff, Plaintiff had on multiple occasions failed to inform administrators of appointments she had scheduled with parents on days that Plaintiff was absent from school, leading to parents coming in for appointments for which Plaintiff did not appear. (*Id.* Ex. M.)  Crandell "often observed [Plaintiff] to be late to meetings [he] attended." (Crandell Aff. ¶ 10.)[7]

During the 2004-05 school year, Thomas met with Plaintiff in an attempt "to assist her in becoming more successful with organizing her work obligations and meeting students' needs." (Thomas Aff. ¶ 7.)  Thomas designed a chart for Plaintiff to use in keeping track of her obligations. (*Id.*)  Plaintiff's schedule was set up so that Plaintiff would have the equivalent of two and one-half days per week of unstructured time in which no counseling sessions were scheduled. (*Id.*)  Plaintiff also was provided with secretarial support; she was, to Thomas's knowledge, the only School Psychologist who received such support. (*Id.* ¶ 9.)

Thomas and Newman discussed Plaintiff's perceived "failure to counsel students in compliance with their IEPs," and they subsequently met jointly with Plaintiff to discuss her performance. (*Id.* ¶ 8.)  At the meeting, Plaintiff disputed Thomas and Newman's "assessment . . . that she was underperforming," but the three "agreed on a schedule" for Plaintiff to "complet[e] her scheduled counseling sessions." (*Id.*)  In Thomas's view, however, Plaintiff's "practices did not sufficiently change." (*Id.* ¶ 9.)

According to Plaintiff, in the spring of 2005, she received a memorandum, signed by

_____

[7] Crandell also found, upon taking over Plaintiff's office at the High School, that "the filing cabinets were unorganized and a mess." (Crandell Aff. ¶ 10.)

Newman, which stated that Thomas alleged that Plaintiff had missed 157 counseling sessions. (Pl. Dep. 67.)  Newman signed that memorandum without having told Plaintiff that he had done so.  (*Id.* 151.)  Plaintiff repeatedly asked Newman to meet with her so that she could explain those "so[-]called misses" to Newman; however, Newman did not meet with Plaintiff.  (*Id.* 151-52.)

At some point, possibly around the beginning of the 2004-05 school year, Plaintiff was asked to attend a meeting with Arnhold-Falanga and Crandell, at which two attorneys were present, and Plaintiff was "grill[ed] . . . as to why [she] believed [that a certain] child . . . ha[d] a disability."  (*Id.* 133.)

In memoranda from Thomas to Plaintiff, dated January 7, 2005, and December 2, 2005, Thomas indicated that parents of children previously counseled by Plaintiff had requested that Plaintiff no longer counsel their children.  (Thomas Aff. Ex. K, at first and fourth unnumbered pages.)  A letter to Thomas from a third set of parents, dated January 3, 2006, made the same request, as did a letter to Plaintiff from a fourth set of parents, dated January 4, 2006.  (*Id.* at second, third, and fifth unnumbered pages.)  The December 2, 2005 memorandum from Thomas to Plaintiff indicated that responsibility for counseling the student had been transferred to another District employee in accordance with the parent's stated preferences.  (*Id.* at first unnumbered page.)  The memorandum also stated that, to date, this was the fourth instance of a parent requesting a different counselor for their child due to complaints about Plaintiff.  (*Id.*)

### 9.  Issuance of Plaintiff's Professional Improvement Plan

In 2005, Thomas and Newman "decided to develop and issue [Plaintiff] a Professional Improvement Plan ('PIP')."  (Thomas Aff. ¶ 11.)  Thomas presented the PIP to Plaintiff and her

union representative at a meeting on November 1, 2005.  (*Id.*)  Thomas, Newman, Plaintiff, and Plaintiff's union representative also met on November 9, 2005, at which time Plaintiff "expressed disagreement with the PIP, but signed it."  (*Id.* ¶ 12; Newman Aff. ¶ 17.)  The PIP stated that Plaintiff's goals would be to "improve organizational and interpersonal skills" and to "meet professional and legal obligations."  (Thomas Aff. Ex. N (PIP).)  The PIP listed eighteen steps that Plaintiff would take and the time period in which Plaintiff would take those steps; for instance, the PIP stated that Plaintiff would "[o]rganize office files and supplies" in November 2005, "[s]end reports to the Special Education Department as completed" throughout the 2005-06 school year, and "[b]e in [her] office when students are scheduled to arrive" on an on-going basis.  (*Id.*)  At the bottom of the PIP, before signing her name, Plaintiff wrote:  "I have been forced by administration [sic] to sign this document.  I disagree with the content and the manner in which I was forced to sign.  My union representative has advised me to sign this so that I won't be insubordinate.  This is the only reason I have initialed and signed."  (*Id.*)  Plaintiff stated at her deposition that she did not think that administrators would have "forc[ed] a male [employee] to sign a document" such as Plaintiff's PIP.  (Pl. Dep. 159.)

According to Thomas, Plaintiff subsequently complied with "some aspects" of the PIP, by giving Thomas "logs of her counseling sessions" and keeping records of the "time she had spent in session with students."  (Thomas Aff. ¶ 13.)

On November 16, 2005, Plaintiff filed a grievance regarding her PIP.  (Hoffman Decl. Ex. D (Dep. of Frank DeLuca ("DeLuca Dep.") 51); Newman Dep. 126-27.)  Plaintiff asked that the District "[e]xpunge" Plaintiff's PIP, grant Plaintiff "release time to complete IEP[s]," and "[c]ease and desist from harassment and overly broad requirements" and "inequitable treatment"

of Plaintiff.  (DeLuca Dep. 54.)  According to DeLuca, the fact that a grievance used the word "harassment" would not necessarily cause the District to investigate whether unlawful harassment took place, because the District had a formal process for making a complaint of discriminatory harassment.  (*Id.* 57.)  At his deposition, DeLuca could not recall whether Plaintiff was given the proper form for making such a complaint following her grievance.[8]  (*Id.* 58.)

Plaintiff asserted at her deposition that administrators "were not asking the younger male psychologist [Crandell] to have that same kind of documentation that [Plaintiff] was forced to do."  (Pl. Dep. 159.)  According to Crandell, however, Tolan "has on a number of occasions requested that I provide him my weekly counseling calendar to verify that I have counseled the students who are required to receive counseling."[9]  (Crandell Aff. ¶ 8.)

Plaintiff, her union representative, DeLuca, and Newman met to discuss Plaintiff's grievance.  (Newman Dep. 127.)  At the meeting, Newman said that they "could take a look at the [PIP]," which Plaintiff "felt . . . was too broad," and that they "could work together to taper it down," but — although at his deposition Newman could not recall what he had actually said — he "would probably have said that we were not going to expunge" the PIP.  (*Id.* 128-29.)

---

[8] The record does not indicate that Plaintiff ever complained to anyone at the District that she was being subjected to discrimination on the basis of age, gender, or disability.  However, Plaintiff stated at her deposition that, at some unspecified time during her employment with the District, she did tell union representatives "[t]hat I'm being discriminated against, and I think there are a variety of things."  (Pl. Dep. 110.)  Plaintiff did not elaborate further.

[9] According to Matthew Whitehurst, the male School Psychologist who later replaced Plaintiff at the Middle School, both Thomas and her successor as Middle School Principal required Whitehurst "to provide a weekly counseling calendar . . . to verify that [he] ha[d] counseled the students who are required to receive counseling."  (Aff. of Matthew Whitehurst in Supp. of Defs.' Mot. for Summ. J. ("Whitehurst Aff.") ¶ 10.)

<u>10.  Plaintiff's Allegations of Unfair Treatment by Thomas and Newman</u>

At Plaintiff's deposition, she made various accusations of what she perceived as unfair treatment by Thomas and Newman.

According to Plaintiff, Thomas sometimes "ma[d]e . . . decision[s]" about matters concerning Plaintiff and "ma[d]e accusations toward" Plaintiff based solely on information from other sources, such as parents, "without any verification whatsoever."  (Pl. Dep. 139.)  For example, following an incident that transpired in an unspecified year, a child's parent asked that Plaintiff never speak with the child again, and Thomas directed Plaintiff not to contact the child, and declined to hear Plaintiff's side of the story.  (*Id.* 139-41.)  In 2004 or 2005, Thomas discontinued a child's counseling with Plaintiff without first discussing the situation with Plaintiff.  (*Id.* 141-42.)  Also in 2004 or 2005, Thomas made a decision about another child over Plaintiff's objections.  (*Id.* 142-44.)

At some unspecified time, Thomas directed an individual named Helen Levote to "spy" on Plaintiff.  (*Id.* at 144-45.)  Levote was put in charge of Plaintiff's schedule and was instructed to write Plaintiff's passes rather than allow Plaintiff to write them herself.  (*Id.* 145.)  At some point between September 2004 and December 2005, Plaintiff asked Thomas to stop having Levote make Plaintiff's passes; Thomas told Plaintiff, "you have the reputation that you don't see your kids," and Thomas was "just making sure that you do."  (*Id.* 145-46.)

Sometime in 2004 or 2005, Newman told Plaintiff, during a phone conversation, that Plaintiff was "being a pain in the ass."  (*Id.* 129, 131.)  Plaintiff complained to Arnhold-Falanga, who was a union representative, about Newman's comment.  (*Id.* 131.)

At some unspecified time, Thomas decided not to allow Plaintiff to miss any counseling

sessions, which was "completely different" than the policy imposed on the District's other School Psychologists.  (*Id.* 146.)

In or around January 2005, Plaintiff said something to a student's parent that led to the parent becoming very upset and calling the student's teacher.  (*Id.* 156-57.)  The teacher blamed the situation on Plaintiff, and at a meeting held to discuss the situation, Newman supported the teacher's position.  (*Id.* 157.)

During the spring of 2005, Thomas either called or directed someone to call Plaintiff "over the loudspeaker at the same time [Thomas] was calling the kids into detention," which Plaintiff viewed as "obnoxious harassment."[10]  (*Id.* 149.)  Plaintiff testified that she did not think administrators would have called a male employee on the loudspeaker.  (*Id.* 159.)

At a meeting attended by Plaintiff, Newman, Thomas, and a union representative, possibly in the spring of 2005, Newman wrongly accused Plaintiff of not completing certain evaluations.  (*Id.* 154.)

At some unspecified time, following an incident in which Plaintiff angered a student's parent by calling the parent and telling her to come in to the school, Plaintiff attended a meeting with the parent, Thomas, and Newman.  (*Id.* 154-55.)  At the meeting, the parent aggressively questioned Plaintiff and took out a tape recorder to record the conversation; Newman asked the parent to stop recording the meeting, "but allowed her to continue to question [Plaintiff] in this nasty awful tone of voice."  (*Id.* 155.)

---

[10] According to Plaintiff, Thomas was paging her over the loudspeaker in order to get her to sign her PIP.  (Pl. Dep. 149.)  However, Plaintiff was not presented with her PIP until November 2005.  Thus, it appears that Plaintiff was mistaken either in testifying that the loudspeaker incident took place in spring 2005 or in testifying that the reason she was paged was that Thomas wanted her to sign her PIP.

According to Plaintiff, at the start of the 2005-06 school year, Newman told Plaintiff he was angry at her for not being available to attend a CSE meeting of which Plaintiff claims she was not made aware.  (*Id.* 131.)  Plaintiff believed that Newman expressed that anger to Plaintiff in retaliation for Plaintiff's unavailability to work during the previous summer.  (*Id.*)  Plaintiff called Arnhold-Falanga to tell her about this incident, but she did not ask the union to file a grievance on her behalf, and she could not recall at her deposition if she asked the union to take any action due to this incident.  (*Id.* 132.)

### 11.  Plaintiff's Final Days of Active Employment with the District

On December 21, 2005, Plaintiff attended a meeting with Newman, special education teacher Rebecca Wilt, guidance counselor Gail Dow-Goldberg, the parent of a District special education student, and the parent's companion; Plaintiff arrived at the meeting late.  (Pl.'s 56.1 ¶¶ 105-09; Newman Aff. ¶ 18; Aff. of Rebecca Wilt in Supp. of Defs.' Mot. for Summ. J. ("Wilt Aff.") ¶¶ 2-3; Aff. of Gail Dow-Goldberg in Supp. of Defs.' Mot. for Summ. J. ("Dow-Goldberg Aff.") ¶ 3.)  Plaintiff sat approximately five feet from Newman.  (Wilt Aff. ¶ 3.)  According to Plaintiff and Newman, during the meeting, while Plaintiff was talking to the parent, Newman touched Plaintiff's arm to interrupt her.  (Pl.'s 56.1 ¶¶ 105-09; Newman Aff. ¶ 18.)  Plaintiff alleged that Newman "grabbed [her] arm" for probably between five and ten seconds "in an attempt to stop [her] from speaking," but that she "continued the conversation for some time period while he was still grabbing my arm."  (Pl. Dep. 160-61, 163.)  According to Newman, he merely happened to "touch[]" Plaintiff's arm "[i]n the course" of "gestur[ing] to [her] that [he] had something to say . . . to the parent at that moment," and upon doing so he "was able to get a word in edgewise"; no one at the meeting reacted to Newman touching Plaintiff's arm, including

Plaintiff.  (Newman Aff. ¶ 18.)  In fact, neither Wilt nor Dow-Goldberg noticed that Newman

had touched Plaintiff's arm during the meeting (Wilt Aff. ¶ 5; Dow-Goldberg Aff. ¶ 4), although

Plaintiff asserted at her deposition that she later "said something" to Dow-Goldberg in reference

to the incident "about what the hell was that," and that Dow-Goldberg responded by saying

"yeah, what was that[?]" (Pl. Dep. 167-68).  Plaintiff suffered no physical injury as a result of

the incident.  (Defs.' 56.1 ¶ 110.)  Plaintiff stated at her deposition that she did not think

Newman "would have ever grabbed a male [individual's] arm" during a meeting with a parent.

(Pl. Dep. 158.)

On December 22, 2005, Plaintiff attended a meeting with Newman, DeLuca, and two

union representatives.  (DeLuca Aff. ¶ 8; Newman Aff. ¶ 19.)  According to Newman, he

"requested the meeting to discuss the fact that [Plaintiff] had attempted to change a student's

[IEP] without following the proper procedures through the CSE."  (Newman Aff. ¶ 19.)

According to DeLuca, at the meeting it was mentioned that Plaintiff had attempted to make such

a change, and also had missed over 157 counseling sessions.  (DeLuca Aff. ¶ 8.)  According to

Newman and DeLuca, Plaintiff disputed Newman's allegations at the meeting and appeared to

be angry.  (*Id.*; Newman Aff. ¶ 19.)  According to Plaintiff, DeLuca "said something [to

Plaintiff] to the effect of [']you're not in private practice['] in a funny tone of voice"; this

comment made Plaintiff "very upset."  (Pl. Dep. 137-38.)  At the meeting, neither Plaintiff nor

her union representatives mentioned Newman's touching of Plaintiff's arm the previous day.

(Pl.'s 56.1 ¶¶ 117-18.)

### 12.  Cessation of Plaintiff's Employment at the District

Plaintiff did not return to active employment at the District after December 22, 2005.

(Defs.' 56.1 ¶ 2.)  From December 23, 2005 through January 3, 2006, Plaintiff was on vacation during the District's winter recess.  (*Id.* ¶ 3.)  As of January 4, 2006, Plaintiff requested and received indefinite sick leave, and she took sick leave through June 23, 2006, i.e., through the end of the school year.  (*Id.* ¶¶ 5-6.)  Plaintiff received full benefits and pay from the District for the remainder of the 2005-06 school year.  (*Id.* ¶ 6.)  Plaintiff requested to take educational leave for the 2006-07 school year, and her request was granted by the Board on August 28, 2006.  (*Id.* ¶ 8.)  The District hired a temporary School Psychologist, Matthew Whitehurst, to replace Plaintiff at the Middle School for the 2006-07 school year.  (*Id.* ¶ 19; Whitehurst Aff. ¶¶ 5, 7.) Whitehurst is male and was under thirty years old at the time of his hiring.  (Whitehurst Aff. ¶ 3.) Plaintiff was advised that she was to notify the District by no later than March 1, 2007 of whether she intended to return to her position at the District for the 2007-08 school year.  (Defs.' 56.1 ¶ 20.)  Plaintiff failed to do so (*id.* ¶ 21), and according to Joseph Sciortino, who had replaced DeLuca as District Superintendent in 2006, Plaintiff finally notified the District in August 2007 that she did not plan to return to work.  (Aff. of Joseph Sciortino in Supp. of Defs.' Mot. for Summ. J. ¶¶ 1, 5.)  On August 20, 2007, the Board unanimously passed a resolution deeming Plaintiff "to have voluntarily resigned from the position of School Psychologist effective July 20, 2007," and Sciortino sent Plaintiff a letter, dated August 22, 2007, that informed her of the resolution.  (*Id.* Ex. J.)

B.  Procedural History

On May 30, 2006, while Plaintiff was on paid sick leave from the District, Plaintiff filed a complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Defs.' 56.1 ¶ 23.)  Plaintiff, represented by current counsel, alleged in her EEOC complaint that

the District discriminated against her on the basis of age, gender, and disability; that the District subjected her to a hostile work environment that "forced [her] to take a medical sick leave"; and that she was the victim of unspecified retaliation.  (Aff. of Jacinda Conboy in Supp. of Defs.' Mot. for Summ. J., Ex. Q (EEOC Compl.) ¶ 3.)  On July 24, 2006, the EEOC dismissed Plaintiff's complaint for failure to state a claim and notified Plaintiff of her right to bring suit. (Defs.' 56.1 ¶ 24.)

On October 23, 2006, Plaintiff and her husband, Eric Stofsky, commenced this action by filing a Complaint against the Board, the District, Tolan, Newman, Thomas, DeLuca, Sciortino, unnamed District administrators, and Pauline Kaplan, who was president of the Board.  Plaintiff and Eric Stofsky filed an Amended Complaint on February 22, 2007.  Defendants moved to dismiss.  Judge McMahon referred the motion to Magistrate Judge Mark D. Fox, who issued a Report and Recommendation ("R&R") on June 20, 2007.  In his R&R, Magistrate Judge Fox recommended that Defendants' motion to dismiss be granted in part and denied in part.

Judge McMahon, in an order filed August 2, 2007, dismissed (1) all claims against Sciortino and Kaplan, (2) all Title VII, ADEA, and ADA claims against the remaining Individual Defendants, (3) all Title VII, ADEA, and ADA retaliation claims relating to acts committed prior to July 28, 2005, as time-barred, (4) Plaintiff's non-retaliation claim of discrimination under the ADA, as time-barred, (5) Plaintiff's claim under the Rehabilitation Act, (6) all claims of due process violations under Section 1983, and (7) all state law claims, including Eric Stofsky's claim for loss of consortium, which was his sole claim.

The remaining claims, all asserted solely by Plaintiff, are that Plaintiff suffered (1) gender and age discrimination and harassment by the District Defendants, in violation of Title

24

VII and the ADEA, (2) retaliation by the District Defendants after July 28, 2005, in violation of

Title VII, the ADEA, and the ADA, and (3) denial of equal protection by all Defendants, in

violation of Section 1983.  Defendant moved for summary judgment on August 1, 2008.

Plaintiff moved on August 29, 2008, to disqualify Defendants' expert witness, and Defendant

moved on September 2, 2008, to disqualify Plaintiff's expert witness.

Oral argument was held on March 18, 2009.

## II.  Discussion

### A.  Standard of Review

Summary judgment may be granted when it is shown that there is "no genuine issue as to

any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "When ruling on a summary

judgment motion, the district court must construe the facts in the light most favorable to the non-

moving party and must resolve all ambiguities and draw all reasonable inferences against the

movant."  *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

A party seeking summary judgment bears the burden of establishing that no genuine issue of

material fact exists.  *See Atl. Mut. Ins. Co. v. CSX Lines, L.L.C.*, 432 F.3d 428, 433 (2d Cir.

2005).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is

sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential

element of the nonmovant's claim.  In that event, the nonmoving party must come forward with

admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary

judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (internal citations

omitted).  "When the moving party has carried its burden under Rule 56(c), its opponent must do

more than simply show that there is some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (footnote

omitted); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006)

("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

 The Second Circuit has "repeatedly expressed the need for caution about granting

summary judgment to an employer in a discrimination case where . . . the merits turn on a

dispute as to the employer's intent."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

"Where an employer has acted with discriminatory intent, direct evidence of that intent will only

rarely be available, so that 'affidavits and depositions must be carefully scrutinized for

circumstantial proof which, if believed, would show discrimination.'" *Id.* (quoting *Gallo v.*

*Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994)).  "Even in the discrimination

context, however, a plaintiff must provide more than conclusory allegations to resist a motion for

summary judgment."  *Id.*; *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d

Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-

intensive context of discrimination cases. . . . [T]rial courts should not treat discrimination

differently from other ultimate questions of fact." (internal quotation marks omitted)).

 B.  Hostile Work Environment Claims

 Plaintiff claims that the District Defendants discriminated against her on the basis of her

gender, in violation of Title VII, and on the basis of her age, in violation of the ADEA, by

subjecting her to a hostile work environment.

 "To state a claim for a hostile work environment in violation of Title VII, a plaintiff must

plead facts that would tend to show that the complained of conduct: (1) is objectively severe or

26

pervasive — that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted).  The analogous standards apply to a claim of hostile work environment under the ADEA, *see Terry v. Ashcroft*, 336 F.3d 128, 147-48 (2d Cir. 2003); the plaintiff must establish that she was subjected to a hostile work environment because of her age, *see Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240-41 (2d Cir. 2007).  Defendants do not appear to contest that Plaintiff subjectively viewed the District Defendants' conduct as hostile or abusive, but they assert that Plaintiff fails to satisfy the other two requirements for a triable case.

### 1.  Objective Abusiveness

"Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.  "[A] single event, if extraordinarily severe, could alter the conditions of a working environment" and provide grounds for finding a hostile work environment. *Mathirampuzha v. Potter*, 548 F.3d 70, 79 (2d Cir. 2008) (internal quotation marks omitted).  "[F]or example, a rape, or an obscene and humiliating verbal tirade that undermines the victim's authority in the workplace," could be

27

sufficiently "severe as to alter materially [an employee's] working conditions." *Id.* (internal citation omitted); *see also Alfano v. Costello*, 294 F.3d 365, 373-74, 379-80 (2d Cir. 2002) (stating the applicable standard for a hostile work environment and collecting cases).

Construing the facts in the light most favorable to Plaintiff, and resolving all ambiguities and drawing all reasonable inferences in favor of Plaintiff, the Court is willing to assume that Plaintiff has established a genuine issue of material fact as to whether the District Defendants subjected her to a work environment that a reasonable person would find hostile or abusive. According to Plaintiff's deposition testimony, District administrators repeatedly burdened Plaintiff with an unreasonable amount of work and not enough time to do it, unfairly yelled at her with co-workers present, unfairly accused her of lying, spread lies about her, told her that she was unwanted and a "pain in the ass," resolved work-related disputes against her without first hearing her side of the story, assigned her to work for many months in an office where temperatures sometimes exceeded 100 degrees, and on one occasion grabbed her arm during a meeting and restrained her for up to ten seconds. *Cf. Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (holding that a coworker's "conduct could reasonably be viewed as having intolerably altered [the plaintiff's] work environment," because although the coworker "made his obscene comments only on one occasion, the evidence is that he did so at length, loudly, and in a large group in which [the plaintiff] was the only female and many of the men were her subordinates"). Assuming *arguendo* that all of these alleged events may be considered notwithstanding the applicable statutes of limitations, the Court further assumes that a reasonable jury could find such conduct to be sufficiently severe as to create a hostile work environment.

2.  Abusiveness Due to Gender or Age

28

However, Plaintiff's hostile work environment claims fail because she has not produced *any* evidence from which a jury could conclude that she was subjected to an abusive work environment on the basis of her gender or age.  For example, Plaintiff has introduced *no* evidence of any gender-related or age-related comments made or actions taken by any District administrator or co-worker, with the exception of Plaintiff's recollection that on a "[c]ouple" of unspecified occasions, unspecified individuals "jointly mentioned" that Plaintiff was the oldest person in the room (Pl. Dep. 88); however, Plaintiff took no offense at these statements and does not suggest that they are evidence of discriminatory animus by the District Defendants, although even if she did, evidence of the statements would not be sufficient to survive summary judgment. *See Douglas v. Dist. Council 37 Mun. Employees' Educ. Fund Trust*, 207 F. Supp. 2d 282, 291 (S.D.N.Y. 2002) ("'Stray' comments do not raise an inference of discrimination.").  Beyond these stray comments, Plaintiff's counsel was unable, when asked at oral argument, to identify a single example of harassing conduct that could be linked to gender or age bias.

In lieu of evidence, Plaintiff offers mere speculation that her mistreatment was related to her gender or age.  At her deposition, Plaintiff said that she did "not think" that Tolan "routinely went about screaming" either at men or at younger women.  Plaintiff expressed her view that Newman likely would not have grabbed the arm of a male colleague in the way he allegedly grabbed Plaintiff's arm, that District administrators would not have asked a male School Psychologist to sign an inappropriate or unfair PIP, and that Thomas would not have paged a male colleague over the school loudspeaker system.  Plaintiff further asserted — without specifying the basis for her personal knowledge — that Crandell, who is male and younger than Plaintiff, was not asked to do the same kind of documentation required of Plaintiff.  Such

obviously self-serving and wholly unsubstantiated conjecture does not justify advancing this case to the trial stage.  *See McPherson*, 457 F.3d at 215 n.4 ("[S]peculation alone is insufficient to defeat a motion for summary judgment.").

Simply put, there is no admissible evidence from which a jury could reasonably infer that Plaintiff was mistreated on account of her gender or age.  In fact, the available evidence is to the contrary.  According to Crandell, Tolan was a demanding supervisor of younger men as well as of older women; during Crandell's employment with the District, Tolan raised his voice at Crandell and placed blame on him.  Crandell and Whitehurst, both male School Psychologists younger than Plaintiff, stated that their jobs were quite challenging and that their supervisors required them to produce documentation of their counseling schedules.

Moreover, even if Plaintiff has demonstrated that she was treated differently from other School Psychologists who were younger or male, which she has not, she has failed to offer any evidence — other than her own subjective views that she was doing a good job as a School Psychologist for the District, that she was always right and her supervisors wrong in disputes about how to counsel students or deal with their parents, that she was justified in missing her scheduled counseling sessions, and so on — that would support an inference that Plaintiff's supervisors were unjustified in the way they treated her, let alone an inference that they subjected her to a hostile work environment because of her gender or her age.  *See Alfano*, 294 F.3d at 378 ("Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex.  But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in

fact discriminatory.").  At most, all Plaintiff has established is that District administrators were not the most nurturing supervisors.  But the law does not require civility, *see Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998) (noting that Title VII is not "a general civility code for the American workplace"); it only requires that employers not manifest discriminatory animus in their supervision of employees.

### 3.  *Faragher*/*Ellerth* Defense

In the alternative, assuming *arguendo* that Plaintiff has established sufficient evidence from which a jury could conclude that Plaintiff was subjected to a hostile work environment because of her age or gender, the District Defendants would still be entitled to summary judgment on grounds that Plaintiff unreasonably failed to make any complaints about gender or age harassment.

"When no tangible employment action is taken, a defending employer may raise an affirmative defense . . . : (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).  "No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."  *Faragher*, 524 U.S. at 808; *Ellerth*, 524 U.S. at 765.

The *Faragher*/*Ellerth* defense also applies to claims of hostile work environment in violation of the ADEA.  *See Knutson v. Brounstein*, No. 99-CV-6094, 2001 WL 1661929, at *5

(S.D.N.Y. Dec. 27, 2001) (applying *Faragher*-*Ellerth* defense to ADEA claim); *Irvine v. Video Monitoring Servs. of Am., L.P.*, No. 98-CV-8725, 2000 WL 502863, at *5 (S.D.N.Y. Apr. 27, 2000) (same); *cf. Terry*, 336 F.3d at 148 (noting that the "same standards apply to hostile work environment claims brought under the ADEA" as apply to claims brought under Title VII).

Plaintiff claims that Defendants cannot raise the *Faragher*/*Ellerth* defense in light of Plaintiff's claims that her harassment "culminate[d] in a tangible employment action," namely "reassign[ment] against her wishes" and then "constructive[] discharge[]."  (Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") 9.)  This argument is unavailing.  First, because Plaintiff's claim of constructive discharge is based on the same evidence as her hostile work environment claim,[11] and not that she "quit[] in reasonable response to an employer-sanctioned adverse action *officially* changing her employment status or situation," *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004) (emphasis added), the alleged constructive discharge does not "rank[] as a tangible employment action" for purposes of negating a *Faragher*/*Ellerth* defense, *id.* at 140; *see also Pugni v. Reader's Digest Ass'n*, No. 05-CV-8026, 2007 WL 1087183, at *17 (S.D.N.Y. Apr. 9, 2007) ("[A] constructive discharge, even if established by the plaintiff, does not amount to a tangible employment action in the context of a *Faragher*/*Ellerth* defense." (citing *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 294-95 (2d Cir. 1999), *overruled on other grounds by In re Initial Pub. Offering Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006))).  Second, Defendants can raise the defense to defeat Plaintiff's hostile work environment claim only if Plaintiff's alleged "tangible employment action" — undesirable reassignment — "was not part of the supervisor's discriminatory harassment."  *Id.*  Though Plaintiff may have perceived her

---

[11] *See infra* Section II.C.1.a.ii.

reassignment to the Middle School as undesirable,[12] Plaintiff has completely failed to rebut the evidence that she was reassigned for reasons unrelated to any alleged harassment, namely, because the District decided (at Plaintiff's own suggestion) to employ one School Psychologist at each of the District's schools, because it was felt that Plaintiff would benefit from working at the Middle School with Thomas, because Plaintiff had been trained in a program for autistic children that was only instituted at the Middle School, and because many High School staff members, including Tolan, had complained about Plaintiff's work.  Thus, the Court considers whether Plaintiff has raised any genuine issue of material fact as to the District Defendants' asserted *Faragher*/*Ellerth* defense.

Plaintiff does not dispute that the District Defendants satisfy the first prong of the defense, but denies that Plaintiff's failure to make a harassment complaint was unreasonable. (Pl.'s Mem. 9.)  Instead, Plaintiff contends that it was reasonable for her to avoid making a complaint, for three reasons.  First, she was supposed to report her complaints of harassment to Tolan and Thomas, who she claims had themselves taken part in the harassment.  (*Id.*)  Second, she believed that reporting the harassment would require "face-to-face confrontation" with her alleged harassers, "which she felt unable to participate in due to the prolonged harassment." (*Id.*)  Third, her doctors directed her "to not have further contact with the District after her departure," so she was unable to file a complaint after December 22, 2005.  (*Id.* 9-10.)

These arguments are unavailing.  "Once an employer has satisfied its initial burden of demonstrating that an employee has completely failed to avail herself of the complaint

---

[12] Notwithstanding Plaintiff's displeasure with her assignment to the Middle School, that transfer was not an adverse employment action at all, *see infra* Section II.C.1.a.i,  let alone a tangible employment action that was part of some discriminatory harassment.

procedure, the burden of production shifts to the employee to come forward with one or more reasons why the employee did not make use of the procedures.  The employer may rely upon the absence or inadequacy of such a justification in carrying its ultimate burden of persuasion." *Leopold v. Baccarat, Inc.*, 239 F.3d 243, 246 (2d Cir. 2001).  For an employee's "reluctance [to report harassment] to preclude the employer's affirmative defense, it must be based on apprehension of what the employer might do" in response to the employee's complaint.  *Id.* (internal quotation marks omitted) (alteration in *Leopold*).  "Evidence must be produced to the effect that the employer has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints." *Id.*  Because Plaintiff "did not come forward with any such evidence," *id.*, in support of her view that her failure to complain was reasonable, she cannot defeat Defendants' *Faragher*/*Ellerth* defense.[13]  *See Caridad*, 191 F.3d at 295 (holding that plaintiff could not preclude the assertion of a *Faragher*/*Ellerth* defense because her reasons for not reporting harassment were "not based on a credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint").  Accordingly, the District is entitled to summary judgment on Plaintiff's hostile work environment claims on *Faragher*/*Ellerth* grounds.

---

[13] Indeed, far from presenting evidence suggesting that Plaintiff had good reason not to make complaints, Plaintiff offers only rationalizations that are facially implausible.  For instance, her claim that her doctors advised her not to have contact with the District after she left active employment there does not explain why she failed to make contemporaneous complaints about the alleged harassment years before she consulted any doctors.  Also, the record reflects that Plaintiff filed union grievances as to several other matters, and did so as late as November 16, 2005, when she filed a grievance regarding her PIP that led to a meeting at which she was required to confront Newman.  It thus defies logic for Plaintiff to argue that it was unreasonable for her to make contemporaneous complaints of discriminatory harassment because she was unable to confront her alleged harassers.

C.  Plaintiff's Title VII and ADEA Discrimination Claims

Plaintiff claims that the District Defendants discriminated against her on the basis of her gender, in violation of Title VII, and on the basis of her age, in violation of the ADEA, by assigning her to work at the Middle School and ultimately effecting her constructive discharge from employment.

The Court considers Plaintiff's claims of Title VII discrimination under the "burden-shifting" framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Holcomb*, 521 F.3d at 138.  Under this framework, "the plaintiff bears the initial burden of establishing a prima facie case of discrimination.  If the plaintiff does so, the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action.  If such a reason is provided, plaintiff may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's [action] was in fact the result of . . . discrimination."  *Holcomb*, 521 F.3d at 138 (quoting *McDonnell Douglas*, 411 U.S. at 802) (internal citations omitted).  Claims of age discrimination brought under the ADEA are analyzed under the same framework.  *See D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 194-95 (2d Cir. 2007).

1.  Plaintiff's Prima Facie Case

A plaintiff satisfies her burden of establishing a prima facie case of employment discrimination if she introduces evidence that raises a reasonable inference that action taken by her employer was based on an impermissible factor.  In particular, a plaintiff must show that:  (1) she was a member of a protected class; (2) she was qualified for her position; (3) she suffered an

adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.  *See Holcomb*, 521 F.3d at 138; *Bryant v. Verizon Commc'ns, Inc.*, 550 F. Supp. 2d 513, 534 (S.D.N.Y. 2008).

Defendants do not contest that Plaintiff can satisfy the first two prongs of the prima facie test for both her Title VI and ADEA claims.  Indeed, Plaintiff alleges discrimination on the basis of her gender and her age (and she was more than forty years old at all relevant times), and she possesses the basic qualifications to be a School Psychologist for the District.  However, Defendants deny that Plaintiff suffered an adverse employment action, and they argue that, even if Plaintiff did suffer such an action, she has not demonstrated that the circumstances surrounding that action permit an inference of discriminatory intent.

### a.  Adverse Employment Action

"An adverse employment action is a materially adverse *change* in the terms and conditions of employment."  *Mathirampuzha*, 548 F.3d at 78 (internal quotation marks omitted). "Employment actions that [the Second Circuit] ha[s] deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (internal quotation marks omitted).  Plaintiff claims that she suffered two adverse employment actions (apart from being subjected to a hostile work environment):  assignment to the Middle School at the start of the 2004-05 school year (Pl.'s Mem. 16-18), and constructive discharge (*id.* 3-6).

### i.  Assignment to Middle School

In the case of an employee's involuntary transfer, "an adverse employment action can exist when an employee's new assignment is materially less prestigious, materially less suited to [her] skills and expertise, or materially less conducive to career advancement." *Beyer*, 524 F.3d at 165 (internal quotation marks omitted); *see also Pacheco v. N.Y. Presbyterian Hosp.*, 593 F. Supp. 2d 599, 617-18 (S.D.N.Y. 2009) (stating standard and holding that plaintiff had not raised a triable issue of fact as to whether he had suffered an adverse employment action where his transfer "resulted in no change in pay, benefits, or bargaining unit seniority" and "nothing in the record . . . support[ed] the notion that the promotion path in [his previous position] was somehow better . . . or that [he] lost out on any specific job opportunity"). "[A] transfer that resulted in the plaintiff's inability to work in [her] area of expertise and [her] subjection to abusive comments from community members could be considered adverse." *Beyer*, 524 F.3d at 165.

"A similar logic applies to denials of transfer requests. The *denial* of a transfer may constitute an adverse employment action at the *prima facie* step of discrimination analysis when . . . a plaintiff adduces sufficient evidence to permit a reasonable factfinder to conclude that the sought for position is materially more advantageous than the employee's current position, whether because of prestige, modernity, training opportunity, job security, or some other objective indicator of desirability." *Id.* "[A] plaintiff [must] proffer objective indicia of material disadvantage; subjective, personal disappointment[] is not enough." *Id.* at 164 (internal quotation marks omitted) (second alteration in *Beyer*).

Assuming *arguendo* that Plaintiff's claim of discriminatory assignment to the Middle School at the start of the 2004-05 school year is not time-barred, Plaintiff has not produced any evidence allowing a jury to conclude that that assignment, whether viewed as a transfer or as a

denial of a transfer, was an adverse employment action.  For example, Plaintiff has produced no

evidence that her move to the Middle School resulted in any decrease in salary, benefits, or

opportunity for job advancement.  Indeed, Plaintiff had for years split her time between the

Middle School and High School, and testified at her deposition that she had repeatedly requested

that she be assigned to work at one school building rather than two and that her assignment to

two different buildings had resulted in her being overworked.  To the extent that Plaintiff had

already been trained and involved in the PACE program for children with autism, the assignment

to the Middle School allowed Plaintiff to continue to work in an area of her expertise.  *See*

*Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000) (rejecting teacher's claim

"that the special education, junior high school keyboarding class [to which he was transferred]

presented job responsibilities that were so different from the mainstream high school

keyboarding class that the change in responsibilities was a setback to his career," in light of the

absence of evidence "show[ing] what particular expertise he developed during those years, [or]

how the transfer impacted on that expertise"); *cf. Rodriguez v. Bd. of Educ. of Eastchester Union*

*Free Sch. Dist.*, 620 F.2d 362, 366 (2d Cir. 1980) (holding that an art teacher had properly

alleged that her transfer from junior high school to elementary school was an adverse

employment action, where the plaintiff's "substantially uncontradicted evidence indicated that

the art programs at the elementary level were so profoundly different from those in the junior

high school as to render utterly useless her twenty years of experience and study").  Moreover,

insofar as Plaintiff's allegations of mistreatment by the High School and Middle School

principals focus substantially on Tolan, the High School principal, Plaintiff's assignment to the

Middle School clearly did not increase her exposure to abuse by supervisors.  Plaintiff offers

38

only her subjective preference for working with High School students and her comfort and familiarity with the High School building and staff; this is not sufficient for a jury to find that her assignment to the Middle School was an adverse employment action.  *See Williams v. R.H. Donnelley Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) ("[S]ubjective, personal disappointments do not meet the objective indicia of an adverse employment action.").

### ii.  Constructive Discharge

"Adverse employment actions include discharge from employment.  Such a discharge may be either an actual termination of the plaintiff's employment by the employer or a 'constructive' discharge."  *Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d Cir. 2001).  "Constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation."  *Morris v. Schroder Capital Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007) (internal quotation marks omitted); *see also Shapiro v. N.Y. City Dep't of Educ.*, 561 F. Supp. 2d 413, 424 (S.D.N.Y. 2008).  "To find that an employee's resignation amounted to a constructive discharge, the trier of fact must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Fitzgerald*, 251 F.3d at 358 (internal quotation marks omitted).  Evidence sufficient to permit a plaintiff to survive summary judgment on a hostile work environment claim may not necessarily be sufficient with respect to a constructive discharge claim, as the latter cause of action "requires deliberate action on the part of the employer" and "inten[tion] to create intolerable workplace conditions."  *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000); *see also Whitright v. Hartford Pub. Schs.*, 547 F. Supp. 2d 171, 180 & n.4

(D. Conn. 2008).  In this case, however, the Court is willing to assume that a jury crediting Plaintiff's testimony might infer the requisite intent from evidence such as Defendants' delay in addressing the extreme temperatures in Plaintiff's office, Tolan's statement to Plaintiff that she was not worth her salary, and Tolan's desire that Plaintiff not be assigned to work at the High School during the 2004-05 school year.  Although there is certainly evidence in the record supporting the opposite inference, the Court assumes that, as with Plaintiff's hostile work environment claim, Plaintiff has proffered sufficient evidence for a jury to find that she was constructively discharged, assuming *arguendo* that none of Plaintiff's allegations are time-barred.

Defendants argue that the Court lacks jurisdiction over Plaintiff's constructive discharge claim, because Plaintiff did not allege constructive discharge in her EEOC complaint, and in fact represented in that complaint that she was still employed by the District.  (Defs.' Mem. in Supp. of Mot. for Summ. J. 6-7.)  "The federal courts generally have no jurisdiction to hear claims not alleged in an employee's EEOC charge."  *Shah v. N.Y. State Dep't of Civil Serv.*, 168 F.3d 610, 613 (2d Cir. 1999).  "Nonetheless, claims that were not asserted before the EEOC may be pursued in a subsequent federal court action if they are 'reasonably related' to those that were filed with the agency."  *Id.* at 614; *see also Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 & n.127 (S.D.N.Y. 2008).  There is conflicting authority within the Second Circuit as to whether failure to exhaust administrative remedies bars a constructive discharge claim in a case such as this, where a plaintiff's EEOC complaint alleged a hostile work environment but not constructive discharge.  *Compare Dunbar v. County of Saratoga*, 358 F. Supp. 2d 115, 129 (N.D.N.Y. 2005) (holding that the plaintiff's constructive discharge claim had

"clear[ed] the administrative exhaustion hurdle" because "it is based upon, at least in part, allegations that plaintiff was subjected to 'obscene, offensive and degrading behavior,' which fairly describes the allegations contained in her EEOC complaint"), *with Chandler v. AMR Am. Eagle Airline*, 251 F. Supp. 2d 1173, 1179 (E.D.N.Y. 2003) (holding that where a "plaintiff remained an . . . employee on unpaid medical leave" and his "EEOC complaint clearly contains no reference to either plaintiff's resignation or termination, . . . plaintiff's constructive discharge claim cannot be said to be 'reasonably related' to any conduct charged in his EEOC complaint").

In this case, unlike *Chandler*, Plaintiff has definitively left her employment with the District, though at the time of her EEOC complaint she was merely on paid sick leave and apparently believed that she would eventually be able to return to work.  Plaintiff claims that though all of the Defendants' acts that effected her constructive discharge had already transpired by the date of her EEOC complaint, she somehow "did not succumb to her inability to return" to work "until August of 2007."  (Pl.'s Mem. 4.)  As in *Dunbar*, Plaintiff essentially asserts that the hostile work environment created by Defendants was what caused Plaintiff to be constructively discharged.  However, the Court need not resolve this issue, because, as discussed below, even assuming *arguendo* that Plaintiff's constructive discharge claim is not barred by failure to exhaust, the District Defendants are still entitled to summary judgment on that claim.

### b.  Inference of Discriminatory Intent

Plaintiff's burden in demonstrating the fourth prong of the prima facie test poses a "low threshold, which the Supreme Court has described as 'minimal.'"  *Holcomb*, 521 F.3d at 139 (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 506).

A plaintiff "may rely on direct evidence of what the defendant did and said in satisfying

her initial burden under *McDonnell Douglas*" to establish an inference of discriminatory intent, such as, "for instance, . . . evidence that the employer had told the employee that he was being fired because of his age." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 77 (2d Cir. 2001) (internal quotation marks omitted).  In this case, Plaintiff has presented neither direct evidence of discriminatory intent, nor indirect evidence such as jokes or remarks suggestive of discriminatory animus; thus, the Court must consider evidence of disparate treatment.

"A showing of disparate treatment — that is, a showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' — is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).  "A plaintiff relying on disparate treatment evidence 'must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself.'" *Id.* (quoting *Graham*, 230 F.3d at 39).  "Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury." *Id.*

Plaintiff has presented her own — purely speculative — deposition testimony that she was, without justification, treated differently from Crandell, a younger male School Psychologist, and from Arnhold-Falanga, a female School Psychologist.  In particular, Plaintiff testified that, without good cause, she was subjected to stricter supervision than her colleagues, burdened with more work, and treated with less respect.  While these circumstances may not be sufficient to support Plaintiff's claim of constructive discharge, it seems reasonable to infer that Crandell was not subjected to the extreme heat of Plaintiff's office, which might support an inference that the District Defendants intentionally created an intolerable working environment

42

for Plaintiff.  This is sufficient to raise an inference of discriminatory intent for purposes of establishing a prima facie case under Title VII and the ADEA.

### 2.  Defendants' Nondiscriminatory Justification for Treatment of Plaintiff

Assuming that Plaintiff's prima facie case creates a presumption of discriminatory constructive discharge, the District Defendants have the burden of articulating a legitimate, nondiscriminatory reason for their treatment of Plaintiff.  This they have done, by offering evidence that Plaintiff's deficient job performance made it necessary to subject her to increased supervision, that Plaintiff was assigned to work at the Middle School for legitimate reasons, that Thomas welcomed Plaintiff's presence at the Middle School, that administrators did not foresee problems with Plaintiff's office and took steps to accommodate Plaintiff's concerns, and that Newman's touching of Plaintiff's arm at a meeting was inadvertent and harmless.  (Defs.' 56.1 ¶¶ 44-47, 50, 57-58, 76-82, 86-87, 90-94, 107-10, 159, 162-63.)  *See Holcomb*, 521 F.3d at 141 (holding that defendant's burden of production was "satisfied by the testimony of [decisionmakers] that they reached the decision [to terminate plaintiff] on race-neutral grounds").

### 3.  Plaintiff's Proffer of Evidence Supporting a Finding of Discrimination

As District Defendants have met their burden of production and proffered a nondiscriminatory reason for their treatment of Plaintiff that allegedly led to Plaintiff's constructive discharge, Plaintiff's claim can survive summary judgment only if Plaintiff can "prove by a preponderance of the evidence that the [District D]efendant[s'] explanations were pretextual," *D'Cunha*, 479 F.3d at 195.  For essentially the reasons stated above, *see supra* Section II.B.2, the Court concludes that Plaintiff has not done so; Plaintiff has adduced no

admissible evidence from which a jury could reasonably infer that she was mistreated on account of her gender or age.

### 4. *Faragher/Ellerth* Defense

In the alternative, for the reasons stated above, *see supra* Section II.B.3, Defendants are entitled to summary judgment on Plaintiff's claim of constructive discharge because there is no genuine issue of material fact as to Defendants' affirmative defense under *Faragher* and *Ellerth*. *See Ferraro v. Kellwood Co.*, 440 F.3d 96, 101 (2d Cir. 2006) (noting that *Faragher/Ellerth* defense applies to constructive discharge).

### D. Plaintiff's Retaliation Claims

Plaintiff claims that the District Defendants retaliated against her in violation of Title VII, the ADEA, and the ADA, subsequent to July 28, 2005.

"The *McDonnell Douglas* burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII. The same standards and burdens apply to claims of retaliation in violation of the ADEA." *Terry*, 336 F.3d at 141 (internal citation omitted). The same is true for ADA retaliation claims. *See Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown*, 294 F.3d 35, 54 (2d Cir. 2002).

### 1. Prima Facie Retaliation

"In order to present a prima facie case of retaliation under Title VII or the ADEA, a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find [1] that [ ] [s]he engaged in protected participation or opposition under Title VII [or the ADEA], [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse

action, i.e., that a retaliatory motive played a part in the adverse employment action." *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 205-06 (2d Cir. 2006) (internal quotation marks omitted) (all alterations but the third in *Kessler*); *see also Moses v. City of New York*, No. 06-CV-5974, 2007 WL 2600859, at *2 (S.D.N.Y. Aug. 28, 2007).  The requirements for presenting a prima facie case of retaliation under the ADA are identical, except that the first prong requires a showing that the plaintiff "engaged in an activity protected by the ADA." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

### a.  Protected Activity Known by Defendants

To satisfy the "protected activity" element of a retaliation claim under Title VII, the ADEA, or the ADA, a plaintiff "need only have had a good faith, reasonable belief that [s]he was opposing an employment practice made unlawful by" the relevant statute.  *Kessler*, 461 F.3d at 210 (internal quotation marks omitted).  "The law protects employees in the filing of formal charges of discrimination as well as in the making of informal protests of discrimination, including making complaints to management . . . ." *Matima v. Celli*, 228 F.3d 68, 78 (2d Cir. 2000) (internal quotation marks omitted).  "As to the second element, implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

Plaintiff's Amended Complaint does not specify the conduct that Plaintiff claims to be the basis for her retaliation claims.  She merely alleges that she "opposed conduct" that was unlawful under the ADEA and Title VII (Am. Compl. ¶¶ 110, 128), and that she "complained

about the discriminatory conduct" that violated the ADEA, Title VII, and the ADA (*id.* ¶¶ 115, 130, 150).

These amorphous assertions are bolstered by no evidence in the record from which a reasonable jury could conclude that Plaintiff ever engaged in protected activity in protesting discrimination or that Defendants understood or could reasonably have understood Plaintiff to have been opposing conduct that she believed in good faith violated Title VII or the ADEA. Although the record reflects that Plaintiff made a variety of complaints to District administrators and other staff during her active employment with the District, there is no evidence that Plaintiff ever characterized any of those complaints as opposing illegal harassment or discrimination, with the possible exception of Plaintiff's November 16, 2005 grievance with respect to Plaintiff's PIP, in which Plaintiff demanded that the District "[c]ease and desist from harassment and overly broad requirements" and "inequitable treatment" of Plaintiff.[14]  There is no evidence

---

[14] Plaintiff argues in her memorandum of law that she "complained to various persons . . . about age discrimination as it concerned being replaced and moved from the high school in favor of a younger male person with less seniority."  (Pl.'s Mem. 13.)  In support of this assertion, Plaintiff cites a portion of her deposition testimony in which she was repeatedly asked whether she had characterized her complaints as being related to her age, and repeatedly declined to say that she had done so:

| Q | Did you make any complaints to the District that you were being discriminated against on the basis of your age? |
|---|---|
| A | I think making a complaint . . . had to do with pushing me around because I am who I am. |
| Q | Did you ever tell anyone at the District that you felt that you were being moved because of your age? |
| A | It was a male 20 years younger than me, so, yeah, I said I don't want to be moved. . . . . |
| Q | Did you tell Mr. Newman that you felt that you were being moved on the basis of your age? |
| A | I told Mr. Newman that I felt I was being moved unfairly. . . . |
| Q | Did you ever tell the union that you felt you were being discriminated against on the basis of your age? |

that Defendants considered any of Plaintiff's grievances or other complaints to be assertions of

gender- or age-based discrimination or harassment, and Plaintiff does not argue that Defendants

could reasonably have understood them as such.  Accordingly, the District Defendants are

entitled to summary judgment as to Plaintiff's Title VII and ADEA retaliation claims.  *See Early

v. Wyeth Pharmaceuticals, Inc.*, No. 07-CV-947, 2009 WL 497362, at *14 (S.D.N.Y. Feb. 25,

2009) ("The onus is on the speaker to clarify to the employer that he is complaining of unfair

treatment due to his membership in a protected class and that he is not complaining merely of

unfair treatment generally.").

As for Plaintiff's ADA retaliation claim, the Court assumes *arguendo* that Defendants

could have reasonably understood Plaintiff's requests for repairs to her office and special

parking privileges to be requests for accommodations for what Plaintiff reasonably and in good

faith believed to be a disability within the meaning of the ADA — namely, Plaintiff's asthma

and other respiratory problems.  For reasons described below, Plaintiff still has not established a

prima facie case of ADA retaliation.

### b.  Adverse Action Taken Against Plaintiff

Plaintiff stated during her deposition that she believed that Defendants retaliated against

her by refusing to "mak[e] a reasonable office change" following her complaints about her

office, and by denying her a parking space closer to the school building.  Essentially, Plaintiff

claims that in response to her protected activity of requesting accommodations of her disability,

---

A       Well, indirectly, yes, because I made a lot of money in comparison to a
        young person.

(Pl. Dep. 109-10.)  Needless to say, Plaintiff's own testimony offers no evidence that she ever
complained to Defendants about any mistreatment because of her gender or age.

the District Defendants retaliated against her by failing to provide those accommodations. (Pl.'s Mem. 15 ("[T]he lack of effective action . . . had the effect of being retaliatory with respect to [Plaintiff] asking for relief in the first place.").) However, there is no evidence in the record from which a jury could conclude that Plaintiff's requests were intentionally denied or that the efforts made to resolve the problems in Plaintiff's office were unreasonable. Plaintiff offers only her subjective belief that District administrators could have addressed the problems more quickly and more effectively; this speculation is not enough to survive summary judgment. And, in any event, what Plaintiff has described is not retaliation — i.e., engaging in conduct to punish Plaintiff for her supposed requests — but merely not quickly agreeing to Plaintiff's demands.[15]

Moreover, Plaintiff concedes that repairs were made to her office in April 2005, and therefore, assuming that failure to make an office change could be an adverse action, such an action is time-barred pursuant to Judge McMahon's dismissal of Plaintiff's retaliation claims relating to acts committed prior to July 28, 2005. *See Harris v. City of New York*, 186 F.3d 243, 247-48 & n.2 (2d Cir. 1999) (noting that an ADA plaintiff in New York must file an EEOC claim within 300 days). Plaintiff has offered no evidence that her problems with her office continued after that date. Also, assuming that a jury could find that Plaintiff was actually denied a desired parking space after July 28, 2005,[16] Plaintiff has presented no evidence from which a

---

[15] The Court notes that Plaintiff has no viable claim of discrimination under the ADA for failure to reasonably accommodate her alleged disabilities, as such a claim was dismissed by Judge McMahon as time-barred.

[16] This is subject to considerable doubt. Plaintiff's deposition testimony was that she was denied a desired parking spot by Tolan sometime prior to 2005, and that at some unspecified time during her employment, Thomas denied her request to park in a lot close to the school building, but told her that she "could get a doctor's note saying [she] had a disability and use the disabled parking," which Plaintiff did.

jury could find that such a denial rose to the level of a "materially adverse change in the terms, privileges, duration and conditions of employment," *Treglia*, 313 F.3d at 720 (internal quotation marks omitted); therefore, such a denial could not be an adverse employment action for purposes of Plaintiff's retaliation claim. *See Maysonet v. Thompson*, No. 03-CV-5223, 2005 WL 975897, at *10 (S.D.N.Y. Apr. 25, 2005) ("Complaints about difficulties obtaining parking spaces . . . do not come close to a material adverse change in working conditions.").

### 2.  Defendants' Nonretaliatory Justification for Treatment of Plaintiff

Assuming *arguendo* that Plaintiff has established a prima facie case of retaliation, the District Defendants have the burden of articulating a legitimate, nonretaliatory reason for their adverse employment action taken against Plaintiff.  As noted above, *see supra* Section II.C.2, Defendants have offered ample evidence that Plaintiff's deficient job performance made it necessary to subject her to increased supervision and other constraints, that Plaintiff was assigned to work at the Middle School for legitimate reasons, that administrators welcomed Plaintiff's presence at the Middle School, and that administrators did not foresee problems with Plaintiff's office and took steps to accommodate Plaintiff's concerns.

### 3.  Plaintiff's Proffer of Evidence Supporting a Finding of Retaliation

As District Defendants have met their burden of production and proffered nonretaliatory reasons for their treatment of Plaintiff, Plaintiff's retaliation claims can survive summary judgment only if Plaintiff can prove that Defendants' explanations were pretextual and that Defendants actually retaliated against Plaintiff.  *See D'Cunha*, 479 F.3d at 195.  For essentially the reasons stated above, *see supra* Section II.C.3, the Court concludes that Plaintiff has not done so.  There is no absolutely no evidence in the record from which a reasonable jury could

conclude that Defendants subjected Plaintiff to any adverse employment action because she asked Defendants to accommodate her asthma, or because she complained about gender- or age-based discrimination or harassment.  Accordingly, even if Plaintiff made out a prima facie case of retaliation — which, as discussed above, she has not — the District Defendants would still be entitled to summary judgment on her retaliation claims.

E.  Plaintiff's Section 1983 Claim

Finally, Plaintiff asserts a cause of action against all Defendants pursuant to Section 1983, claiming that Defendants violated her constitutional right to equal protection.

"[Section] 1983 and the Equal Protection Clause protect public employees from various forms of discrimination, including hostile work environment and disparate treatment . . . .  Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals."  *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006).  The *McDonnell Douglas* burden-shifting framework applies to Section 1983 claims.  *See id.*

Defendants are entitled to summary judgment on Plaintiff's Section 1983 claim for the same reasons, discussed above, that summary judgment is appropriate with regard to Plaintiff's Title VII, ADEA, and ADA claims.  Because Plaintiff's equal protection claim is based on the same facts as her statutory discrimination claims, and "[t]he standards for liability for plaintiff[']s claims brought under [Section 1983] are the same as those under the . . . federal anti-discrimination laws" (Pl.'s Mem. 20), Plaintiff's Section 1983 claim likewise fails to survive summary judgment.  *See Berhanu v. N.Y. State Ins. Fund*, Nos. 91-CV-4956, 91-CV-6088, 93-

CV-6891, 1999 WL 813437, at *15 (S.D.N.Y. Oct. 18, 1999) ("For the same reasons that the defendants are due summary judgement on the Title VII claims, they are due summary judgement on the Section 1983 claims as well.").

F.  Motions to Disqualify Expert Witnesses

Because Defendants are entitled to summary judgment dismissing all of Plaintiff's claims, the Parties' motions to preclude expert testimony on the issue of damages are denied as moot.

III.  Conclusion

For the reasons stated herein, Defendants' motion for summary judgment is granted. Plaintiff's and Defendants' respective motions to preclude expert testimony from trial are denied as moot.  The Clerk of Court is respectfully directed to terminate all pending motions (Dkt. Nos. 62, 94, 111), to enter judgment for Defendants, and to close this case.

SO ORDERED.

Dated:        March 27, 2009
              White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

Service List (by ECF):

Peter David Hoffman
Law Office of Peter D. Hoffman, PC
200 Katonah Avenue
Katonah, NY  10536
pdh2@pdhoffmanlaw.com

Gregg Tyler Johnson, Esq.
Girvin & Ferlazzo, P.C.
20 Corporate Woods Blvd.
Albany, NY  12211
gtj@girvinlaw.com

Jacinda Hall Conboy, Esq.
Girvin & Ferlazzo, P.C.
20 Corporate Woods Blvd.
Albany, NY  12211
jhc@girvinlaw.com

Scott Patrick Quesnel, Esq.
Girvin & Ferlazzo, P.C.
20 Corporate Woods Blvd.
Albany, NY  12211
spq@girvinlaw.com